UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X
RAYMOND BROWN,                                    :
                                                  :
             Plaintiff,                           :    Report and Recommendation
                                                  :
           -against-                                :    10 Civ. 3830 (LTS) (JCF)
                                                  :
BRIAN FISCHER Commissioner for                    :
NYS Correct., WILLIAM J. CONNOLLY,                :
Superintendent, Fishkill Corr., MR. BELL,         :
D.S.S. Fishkill Corr., J. MULEN,                  :
Urineanalysis Tester C.O., ANTHONY                :
CAREW, Work Release Counselor                     :
Fishkill,                                         :
                                                  :
            Defendants.                          :
--------------------------------------------------------X
TO THE HONORABLE LAURA TAYLOR SWAIN, U.S.D.J.:

      Raymond Brown, a prisoner at the Collins Correctional Facility, brings this action *pro se* pursuant to 42 U.S.C. § 1983, alleging that the defendants violated his constitutional rights while he was participating in a work release program at Fishkill Correctional Facility ("Fishkill"). Mr. Brown claims that prison officials unfairly issued a misbehavior report for a urinalysis that registered a "false positive" for a controlled substance. As a result, Mr. Brown entered a relapse program "under duress" and was denied merit time. Mr. Brown alleges that the defendants subjected him to cruel and unusual punishment in violation of the Eighth Amendment and seeks monetary damages and injunctive relief. The named defendants are Brian Fischer, the Commissioner of the New York State Department of Correction and Community Supervision ("DOCS"); William J. Connolly, the Superintendent of Fishkill; Mr. Bell, "D.S.S. Fishkill"; J. Mullen, the correction officer who conducted the urinalysis testing; and Anthony Carew, Mr. Brown's work release counselor.[1] The defendants have moved to dismiss the action pursuant to

---

[1] Mr. Brown has not provided the first names for Mr. Bell or Officer Mullen.

Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.  For the following reasons, I recommend that their motion be granted.

## BACKGROUND[2]

Mr. Brown entered DOCS custody in 2005 to serve a seven-year sentence, having been convicted of criminal possession of a controlled substance in the third degree.[3]  On December 28, 2009, Andrew Carew, Mr. Brown's work release counselor, directed him to submit to a random urinalysis.  (Complaint ("Compl.") at 4).  Correction Officer Mullen performed the test on a "Syva 'Viva Jr' machine" that he is certified to operate.  (Inmate Misbehavior Report dated Dec. 28, 2009 , attached to Compl.).  The specimen was taken at 8:20 a.m., picked up by Officer Mullen at 9:15 a.m., tested at 10:54 a.m. and again at 12:14 p.m., and disposed of at 12:35 p.m.  (Request for Urinalysis Test, attached to Compl.).  Both the initial test and the confirmatory test came back positive for opiates.  (Inmate Misbehavior Report).

DOCS utilizes a "cutoff calibrator rate" of .269 for opiates.  (Urinalysis Procedure forms, attached as Exh. 1 to Compl.).  Mr. Brown's opiate levels were .360 and .358 for the first and second test, respectively.  (Urinalysis Procedure Forms).  The Request for Urinalysis  Test form contains the question "Has inmate taken medication recently?" followed by the word "specify" and a line for a response.  Next to this question, the word "Yes" is circled; however, the line next to it is blank.  Mr. Brown's submissions to the Court do not clarify whether he was taking medication or, if so, what type.

---

[2] The factual allegations are taken from the complaint as well as the documents attached to it.

[3] http://nysdocslookup.docs.state.ny.us/GCA00P00/WIQ1/WINQ000, Department of Corrections and Community Supervision, Inmate Information For Inmate #05A6373  (last visited August 15, 2011).

After learning two days later that he had tested positive for opiates, Mr. Brown denied using any drugs. (Compl. at 4). Mr. Carew advised Mr. Brown that he had "lost [his] merit board" and that his options were to "go to the box [,] fight the ticket [,] and lose" or enter a relapse program and keep his work release status. (Compl., ¶ IID). Mr. Brown opted for the relapse program "out of duress of losing the hearing." (Compl., ¶ IID). Before an inmate enters a release program, he must sign an agreement, which states in relevant part:

> I understand that the results of [the urinalysis] constitute a violation of Departmental, institutional and/or temporary release program rules and regulations. I also understand that, based upon the subject test results, I would ordinarily be served with a misbehavior report alleging a violation of the Standards of Inmate Behavior and be referred to the Temporary Release Committee for a temporary release removal proceeding. I agree, however, to waive service of a misbehavior report and any disciplinary proceeding on this issue. I further agree to participate in the Department's Relapse Program for alcohol and substance abuse treatment. . . . I understand that I will be transferred to a general confinement facility in order to participate in the Relapse Program and that the Relapse Program will last approximately sixty days. . . . Thereafter, if I have successfully completed the Treatment Program, I will be returned to full participation in the continuous temporary release program.

7 N.Y.C.R.S. § 1904.3. The agreement also requires the prisoner's signature under the statement "I have read and fully understand and agree to the above terms and conditions." 7 N.Y.C.R.R. § 1904.3.[4]

On the same day Mr. Brown agreed to enter the relapse program, he also initiated a grievance, claiming that

> [p]roper procedures to ensure that my urine sample was not contaminated nor mixed up with another inmates [sic] were not

---

[4] Mr. Brown's signed agreement is not part of the record; however, the form agreement itself is included in the regulations governing the relapse program, 7 N.Y.C.R.R. § 1904.3, and Mr. Brown does not dispute that he signed it.

3

> followed, and no appropriate chain of custody was preserved. I wish to grieve this as it resulted in a "dirty urine" result, when I had not done drugs, on 12/28/09.

(Inmate Request Form, attached as part of Exh. 4 to Compl.). On that form, the handwritten response states:

> [Y]ou were called down for a hearing regarding this subject and asked to speak w/ the IGRC Sgt. According to the IGRC Sgt. you were informed of the correct procedures available to you.

(Inmate Request Form). Mr. Brown also wrote to Superintendent Connolly, who denied his request for additional testing:

> In response to your above referenced letter, be advised that the test you requested is denied. If you want to prove your innocence, I suggest you attend your hearing.

(Memorandum of William J. Connolly dated Dec. 30, 2009 ("Connolly Memo.") , attached as part of Exh. 4 to Compl.).[5] Mr. Brown characterizes Superintendent Connolly's response as "challenging" and "threat[e]ning." (Compl., ¶¶ IID, IIF.2). Believing he was "not allowed to challenge or grieve procedures" because a misbehavior report had been issued, Mr. Brown did not pursue the grievance process. (Compl., ¶ IIIE). Mr. Brown also wrote to Commissioner Fischer, and he received the following response from a DOCS assistant commissioner:

> A review of your record indicates you accepted the conditions of the Relapse Program rather than proceed with the disciplinary process. The drug misbehavior report at this point is moot.

(Letter of Theresa A. Knapp-David dated Feb. 2, 2010, attached as part of Exh. 4 to Compl.). The positive urinalysis resulted in the denial of Mr. Brown's merit time. (Merit Time Determination Notices, attached as part of Exh. 4 to Compl.).

---

[5] Defendant Bell is copied on the Connolly memo as the "Tier III hearing officer." (Connolly Memo.).

In his complaint, Mr. Brown raises five challenges to the testing process based on: (1) the two-hour delay between the taking of his sample and the testing; (2) the lack of an identification label and seal on the specimen; (3) the fact that he was asked only whether he took medication, not what type, raising the possibility that the positive result occurred from legitimate medication; (4) his sample having not been sent to an independent laboratory to determine the type of opiate detected; and (5) DOCS's failure to follow the National Institute of Drug Abuse ("NIDA") protocol utilizing a cutoff level of .300 for opiates rather than .269, which increases "the occurrence of false positives." (Compl. at 4-6, ¶ IID).

Mr. Brown also challenges his entry into the relapse program. He asserts that Mr. Carew and Superintendent Connolly coerced him into making the decision, and he challenges the denial of his merit time. (Compl. at 4, ¶¶ IID, V). Mr. Brown alleges that the defendants subjected him to "a significant atypical hardship." (Compl., ¶ IID). In addition to damages, Mr. Brown seeks removal of the misbehavior report from his record, changes in the testing policy, and restoration of his merit time. (Compl., ¶ V).

The defendants have moved to dismiss the complaint on the grounds that: (1) Mr. Brown's claims regarding the relapse program, testing process, loss of merit time, and false misbehavior report do not state due process or other constitutional violations; (2) the Eleventh Amendment bars Mr. Brown's claims for monetary damages brought against the defendants in their official capacities; (3) Mr. Brown failed to exhaust his administrative remedies as required by the Prisoner Litigation Reform Act; (4) Mr. Brown failed to allege the personal involvement of defendants Fischer and Bell; and (5) the defendants are entitled to qualified immunity. (Memorandum of Law in Support of Defendants' Motion to Dismiss the Complaint).

In his opposition papers, Mr. Brown reiterates his objection that no independent test was done and that DOCS does not follow the NIDA protocol:

> On site testing is commonly used in the Criminal Justice System, but is unacceptable under the NIDA mandatory/guidelines, unless positive results are screened and confirmed by [an] independent lab using preferably GC/MS Gas Chromatography/Mass Spectometry ("GS/MS").

(Plaintiff's Affirmation in Response at 1). In reply, the defendants argue that the DOCS testing method, the Enzyme Multiplied Immunoassay Technique ("EMIT"), is sufficiently reliable and that Mr. Brown has no right to GS/MS or independent testing. (Reply Memorandum of Law in Further Support of Defendants' Motion to Dismiss the Complaint at 2).

## **DISCUSSION**

I.   Standard of Review

In considering a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a court must accept all factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff. Erickson v. Pardus, 551 U.S. 89, 93-94 (2007) (per curiam); DiFolco v. MSNBC Cable L.L.C., 622 F.3d 104, 110-11 (2d Cir. 2010). A complaint need not make "'detailed factual allegations,'" but it must contain more than mere "'labels and conclusions'" or "formulaic recitation[s] of the elements of a cause of action.'" Ashcroft v. Iqbal, _ U.S. _, _, 129 S. Ct. 1937, 1949 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007)). Where the complaint's factual allegations permit the court to infer only that it is possible, but not plausible, that misconduct occurred, the complaint fails to meet the minimum standard. Id. at _, 129 S. Ct. at 1950. In ruling on a motion to dismiss, the court's task "'is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof.'" GVA Market Neutral

Master Ltd. v. Veras Capital Partners Offshore Fund, Ltd., 580 F. Supp. 2d 321, 327 (S.D.N.Y. 2008) (quoting Eternity Global Master Fund Ltd. v. Morgan Guaranty Trust Co. of New York, 375 F.3d 168, 176 (2d Cir. 2004)).

*Pro se* complaints are held to less stringent standards than those drafted by lawyers. Erickson, 551 U.S. at 94; see also McKeown v. New York State Commission on Judicial Conduct, 377 Fed. Appx. 121, 122 (2d Cir. 2010). In fact, pleadings of a *pro se* party should be read "'to raise the strongest arguments that they suggest.'" Kevilly v. New York, 410 Fed. Appx. 371, 374 (2d Cir. 2010) (quoting Brownell v. Krom, 446 F.3d 305, 310 (2d Cir. 2006)). Even after Iqbal, in which the Supreme Court imposed heightened pleading standards for all complaints, *pro se* complaints are to be liberally construed. See Harris v. Mills, 572 F.3d 66, 71-72 (2d Cir. 2009). Dismissal of a *pro se* complaint is nevertheless appropriate where a plaintiff has clearly failed to meet minimum pleading requirements. See, e.g., Rodriguez v. Weprin, 116 F.3d 62, 65 (2d Cir. 1997; accord Honig v. Bloomberg, No. 08 Civ. 541, 2008 WL 8181103, at *4 (S.D.N.Y. Dec. 8, 2008), aff'd, 334 Fed. Appx. 452 (2d Cir. 2009).

On a motion to dismiss, the court is generally limited to reviewing the allegations in the complaint and documents attached to it or incorporated by reference. See Chambers v. Time Warner, Inc., 282 F.3d 147, 152-55 (2d Cir. 2002). The court may, however, consider documents "'integral to the complaint'" or those that were necessarily relied on by the plaintiff in drafting the complaint. Roth v. Jennings, 489 F.3d 499, 509 (2d Cir. 2007) (emphasis omitted) (quoting Cortec Industries, Inc. v. Sum Holding L.P., 949 F.2d 42, 47 (2d Cir. 1991)).

II.      The Merits

    A.  Eighth Amendment

Mr. Brown filed this complaint pursuant to 42 U.S.C. § 1983, alleging that the defendants violated his rights under the Eighth Amendment to the United States Constitution. To state a claim under Section 1983, the plaintiff must allege that, while acting under color of state law, the defendants deprived him of his federal constitutional or statutory rights. 42 U.S.C. § 1983; see McKithen v. Brown, 481 F.3d 89, 99 (2d Cir. 2007). Here, Mr. Brown claims that the defendants subjected him to cruel and unusual punishment in violation of the Eighth Amendment. The Eighth Amendment explicitly prohibits the infliction of "cruel and unusual punishment," U.S. Const. amend. VIII, and precludes the "unnecessary and wanton infliction of pain," Gregg v. Georgia, 428 U.S. 153, 173 (1976); accord Sims v. Artuz, 230 F.3d 14, 20 (2d Cir. 2000). "[T]o establish a violation of his Eighth Amendment rights, an inmate must show (1) a deprivation that is 'objectively, sufficiently serious' that he was denied 'the minimal civilized measure of life's necessities,' and (2) a 'sufficiently culpable state of mind' on the part of the defendant official, such as deliberate indifference to inmate health or safety." Gaston v. Coughlin, 249 F.3d 156, 164 (2d Cir. 2001) (quoting Farmer v. Brennan, 511 U.S. 825, 834 (1994)). The complaint is devoid of any facts indicating that the plaintiff was subjected to the unnecessary and wanton infliction of pain or denied the minimal civilized measure of life's necessities.

    B.  Fourteenth Amendment

Although Mr. Brown does not explicitly invoke it, the complaint could be construed to allege due process claims arising under the Fourteenth Amendment. To establish a due process violation, "it is necessary to prove that the state has created a protected liberty interest and that

the process due was denied." Wright v. Coughlin, 132 F.3d 133, 136 (2d Cir. 1998) (citing Kentucky Department of Corrections v. Thompson, 490 U.S. 454, 460 (1989)); accord Rivera v. Wohlrab, 232 F. Supp. 2d 117, 120-21 (S.D.N.Y. 2002).  In addition, a prisoner raising a due process claim in connection with a disciplinary action must also allege that the resulting confinement or restraint created an "atypical and significant hardship . . . in relation to the ordinary incidents of prison life."  Sandin v. Conner, 515 U.S. 472, 484 (1995); accord Vega v. Lantz, 596 F.3d 77, 83 (2d Cir. 2010); Romer v. Morgenthau, 119 F. Supp. 2d 346, 356-59 (S.D.N.Y. 2000) (applying Sandin analysis to deny work release claim).  Whether the confinement or restraint was "atypical and significant" entails both a fact-intensive comparison of the conditions of the challenged confinement to those in the general population and in other categories of segregation, and a consideration of that confinement's duration.  See, e.g., Ayers v. Ryan, 152 F.3d 77, 83 (2d Cir. 1998); Arce, 139 F.3d at 336; Wright, 132 F.3d at 137.  In other words, the court must balance the nature and severity of the deprivation with its duration; while some conditions implicate a liberty interest when suffered for any length of time, other less serious deprivations may infringe a liberty interest only when endured for a substantial period.  See, e.g., Arce, 139 F.3d at 336-37 (level of hardship may be offset by brevity of confinement); McClary v. Kelly, 4 F. Supp. 2d 195, 209-11 (W.D.N.Y. 1998) (deprivations that are not atypical and significant may become so as length of time increases).

In his pleading, Mr. Brown objects to his diversion into the relapse program, the drug screening process, the denial of merit time and the issuance of the misbehavior report.  (Compl., ¶ V).  Even accepting all factual allegations in the complaint as true,  however, Mr. Brown has failed to state a due process claim.

1. Mr. Brown's Diversion into the Relapse Program

Mr. Brown objects to his temporary removal from the work release program and entry into the relapse program. Although prisoners do not have an enforceable right to gain entry to work release programs, they do have a liberty interest in remaining in such programs once their participation has commenced. See Anderson v. Recore, 446 F.3d 324, 328 (2d Cir. 2006) ("There is no question that [the plaintiff] has a liberty interest in continuing his participation in the temporary release program."); Friedl v. City of New York, 210 F.3d 79, 84 (2d Cir. 2000) ("Prisoners on work release have a liberty interest in continued participation in such programs."); Kim v. Hurston, 182 F.3d 113, 117-18 (2d Cir. 1999). A prisoner's "significant liberty interest in continuing in a temporary release program" requires advance written notice of any charges of misconduct, a pre-deprivation hearing that provides some opportunity to call witnesses and confront the evidence, and a written statement of the decision. Anderson, 446 F.3d at 329; see also Wolff v. McDonnell, 418 U.S. 539, 563-66 (1974)). A prisoner who receives a misbehavior report based on a positive urinalysis can challenge the chain of custody and other circumstances surrounding the process at such a hearing. See, e.g., Marino v. Humphrey, No. 05 Civ. 6571, 2006 WL 2786182, at *2-3 (S.D.N.Y. Sept. 27, 2006); Rivera, 232 F. Supp. 2d at 119, 122-23.

Upon testing positive for illegal drug use, a prisoner's work release status may be revoked, or he may be given the opportunity to enter a relapse program. 7 N.Y.C.R.R. §§ 1904.1, 1904.3. Entering a relapse program requires the prisoner to accept the violation, waive "service of a misbehavior report and any disciplinary proceeding," and enter a sixty-day program at a "general confinement facility." 7 N.Y.C.R.R. § 1904.3. Upon successful completion, the prisoner is returned to "full participation" in the work release program. 7 N.Y.C.R.R. § 1904.3; cf. Polidori v. Joy, No. 06 Civ. 6004, 2008 WL 189668, at *1 (W.D.N.Y. Jan. 18, 2008) (prisoner

10

"temporarily removed" from work release rejoined program after successfully completing sixty-day program); Constantino v. Goord, 34 A.D.3d 1020, 2020-21, 824 N.Y.S.2d 468, 469-70 (3d Dep't 2006) (holding no constitutional violation in petitioner's permanent removal from work release after he failed to complete program).

To be sure, Mr. Brown had a liberty interest in his continued participation in the work release program and that interest entitled him to a pre-deprivation hearing before any adverse action could be taken. In this case, however, Mr. Brown received all the process he was due. The positive urinalysis generated a misbehavior report that informed him of the nature of the misconduct charges. Prison officials then presented Mr. Brown with two options: he could enter a relapse program or he could pursue his right to a disciplinary hearing where he would be given the opportunity to challenge the misbehavior report and the circumstances giving rise to it by presenting evidence and calling witnesses. Mr. Brown chose to enter a relapse program. Accordingly, he was diverted to a sixty-day treatment program at a general confinement facility that, upon successful completion, enabled him to return to the work release program. Although Mr. Brown was temporarily removed from the work release program, his status was not revoked.

There do not appear to be other cases discussing the provision of Section 1904.3 requiring a prisoner to waive his right to a disciplinary hearing before entering the relapse program. Courts in this district, however, have held that prisoners who waive particular rights during disciplinary proceedings are foreclosed from later raising objections to those matters. E.g., Bedoya v.Coughlin, 91 F.3d 349, 352-53 (2d Cir. 1996).

> "Under ordinary circumstances, when an inmate voluntarily waives his appearance before a disciplinary hearing officer, he cannot then attack the adjudication as violative of his constitutional rights. An inmate's refusal to attend a disciplinary hearing waives his due

11

>process objections . . . when it occurs through no fault of prison officials."

Tafari v. McCarthy, 714 F. Supp. 2d 317, 380 (N.D.N.Y. 2010) (quoting Howard v. Wilkerson, 768 F. Supp. 1002, 1006 (S.D.N.Y. 1991)); see also Scott v. Gardner, No. 02 Civ. 8963, 2005 WL 984117, at *3 (S.D.N.Y. April 28, 2005) (prisoner waived right to raise retaliation claim at hearing by not posing any questions or asking to call witnesses regarding that issue); Jackson v. Johnson, 30 F. Supp. 2d 613, 619-21 (S.D.N.Y. 1998) (prisoner's silence can constitute waiver of right to assistance at hearing).  The same reasoning applies to the facts here.  That the plaintiff explicitly waived his right to a due process hearing precludes him from objecting now to the testing process and its results.

Mr. Brown asserts that Mr. Carew and Superintendent Connolly discouraged him from pursuing his appeal rights and that he entered the relapse program solely because he feared losing his work release status, not because he committed the charged misconduct.  Even if Mr. Brown felt conflicted in making the choice he did, these facts do not give rise to a due process claim.  Such situations arise regularly in connection with prison rehabilitative programs.  For example, in McKune v. Lile, 536 U.S. 24 (2002), the Supreme Court rejected a Fifth Amendment challenge to a prison sex offender program that required participants to discuss uncharged acts, even if their refusal to participate resulted in a loss of privileges.  The Court noted that the

>"criminal process, like the rest of the legal system, is replete with situations requiring the making of difficult judgments as to which course to follow. Although a defendant may have a right, even of constitutional dimensions, to follow whichever course he chooses, the Constitution does not by that token always forbid requiring him to choose."

Id. at 41 (quoting McGautha v. California, 402 U.S. 183, 213 (1971)).  In the same vein, Mr. Brown was presented with an option that implicated a constitutional right.  That he was confronted with such a choice does not, however, state a constitutional violation.

        2.   The Drug Screening Process

Mr. Brown challenges various aspects of DOCS' drug testing methodology.  That process, however, has withstood constitutional challenge.  See DOCS Directive # 4937; McCormack v. Cheers, 818 F. Supp. 2d 584, 589-90 (S.D.N.Y. 1993)) ("'[w]ith a 98+% rate of accuracy, the double EMIT testing as performed by DOCS is sufficiently reliable so that the use of the results as evidence, even as the only evidence, in a disciplinary hearing does not offend due process.'"  (quoting Robinson v. Scully), No. 89 Civ. 7244, 1993 WL 340998, at *6 n.8 (S.D.N.Y. Aug. 23, 1993)); Rivera, 232 F. Supp. 2d at 124.  Moreover, prisoners do not have a right to independent testing, even at their own expense.  Mathie v. Goord, 267 Fed. Appx. 13, 14 (2d Cir. 2008) (rejecting as "without merit" prisoner's challenge to DOCS procedure for destroying urine samples after testing and prohibiting prisoners from obtaining independent testing at their own expense).

Mr. Brown objects that DOCS utilizes a .269 cutoff for opiates, which is lower than the .300 cutoff recommended by NIDA.  According to Mr. Brown, the higher cutoff level minimizes the incidents of false positives.  As pointed out by the defendants, however, the opiate levels from Mr. Brown's tests were .358 and .360, both well above the .300 level.  Based on these results, Mr. Brown's tests would have registered positive under either standard.  In any event, Mr. Brown has no right to any particular type of testing method or to independent testing.

3. The Denial of Merit Time

Mr. Brown objects to the loss of merit time.  Merit time, which may be awarded to DOCS prisoners who have not been convicted of certain specified felonies and have completed certain programs intended to facilitate their re-entry to society, can reduce a determinate sentence by one-seventh.  N.Y. Correct. L. § 803(1)(d); DOCS Directive # 4790; Atwood v. Williams, No. 10 Civ. 2557, 2011 WL 1991452, at *1 n.1 (S.D.N.Y. May 19, 2011).  A merit time allowance may be withheld for "any serious disciplinary infraction," N.Y. Correct. L.  § 803(1)(d)(iv); DOCS Directive  # 4790(II)(B); People v. Paniagua, 45 A.D.3d 98, 105-06 (1st Dep't 2007), and a serious disciplinary infraction includes illegal substance abuse,  7 N.Y.C.R.R. §§ 270.2(B)(14)(xiv), 280.2(b)(2).  For this reason, prisoners who test positive for substance abuse or enter a relapse program are not eligible for merit time.  See DOCS Dir. # 4790 §§ (B)(2)(r) (D)(2)(c), ; 7 N.Y.C.R.R. § 280.2(d)(2)(iii); Atwood, 2011 WL 1991452, at *2; Ramos v. New York State Department of Correctional Services, 62 A.D.3d 1174, 1174-75, 878 N.Y.S.2d 638, 639 (3d Dep't 2009) (affirming denial of merit time based on substance abuse).

Prisoners have no constitutionally-protected liberty interest in parole or other conditional release from prison before the expiration of a valid sentence.  Greenholtz v. Inmates of Nebraska Penal and Correctional Complex, 442 U.S. 1, 7 (1979); Barna v. Travis, 239 F.3d 169, 171 (2d Cir. 2001).  In addition, prisoners have no constitutional right to discretionary good time release or to participation in prison programs that might expedite their release.  Abed v. Armstrong, 209 F.3d 63, 66-67 (2d Cir. 2000); see also Harrison v. Fischer, No. 08 Civ. 1327, 2010 WL 2653629, at *7 (N.D.N.Y. June 7, 2010) ("The Second Circuit has [] held that inmates have no constitutionally protected liberty interest in internal classifications or eligibility for rehabilitative programs."), report and recommendation adopted, 2010 WL 2653477 (N.D.N.Y. June 29, 2010).

In this case, Mr. Brown signed an agreement recognizing that the positive urinalysis constituted a violation of DOCS rules and regulations.  That he was denied merit time as a result of the positive drug test and his entry into the relapse program therefore does not state a constitutional violation.

### 4. The Misbehavior Report

The complaint could also be construed to allege that the defendants issued a false misbehavior report against Mr. Brown.  As long as a prisoner is provided with due process, he has no independent constitutionally-protected right against being falsely accused of misconduct that may result in the deprivation of a protected liberty interest.  Boddie v Schneider, 105 F.3d 857, 862 (2d Cir. 1997).  As the Second Circuit has explained:

> [A] prison inmate has no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest.  The plaintiff, as all other prison inmates, has the right not to be deprived of a protected liberty interest without due process of law.

Freeman v. Rideout, 80 F.2d 949, 951 (2d Cir. 1986); accord Thomas v. Calero, No. 09 Civ. 5209, 2011 WL 1532058, at *6-7 (S.D.N.Y. March 17, 2011),  report and recommendation adopted, 2011 WL 1532061 (S.D.N.Y. April 20, 2011).  The filing of a false misbehavior report may be actionable only if made in retaliation for a prisoner's exercise of his constitutional rights. See Gill v. Pidlypchak, 389 F.3d 379, 380 (2d Cir. 2004).  Here, Mr. Brown received all the process he was due and fails to allege facts giving rise to an inference of retaliation.

### C. Immunities and Other Defenses

The defendants pled the affirmative defenses of qualified immunity, Eleventh Amendment immunity, and failure to exhaust administrative remedies as required by the Prisoner Litigation Reform Act.  Because dismissal of this action is warranted for failure to state a claim upon which relief can be granted, I decline to address these matters.  See Saucier v. Katz, 533 U.S. 194, 201

(2001) ("If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity."); see also Pearson v. Callahan, 555 U.S. 223, 236 (2009) ("[Courts] should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."); cf. Sedney v. Haase, No. 00 Civ. 1302, 2003 WL 22110455, at *5 (S.D.N.Y. Sept. 12, 2003) (observing that PLRA permits a court to dismiss case on the merits without regard to exhaustion); Romer, 119 F. Supp. 2d at 360 (given that pleadings "do not demonstrate a sufficient constitutional liberty interest, consideration of the form of immunity which defendants may assert is unnecessary") . For similar reasons, I need not address whether Mr. Brown sufficiently alleged the personal involvement of defendants Fischer and Bell.

## CONCLUSION

For the reasons set forth above, I recommend that the defendants' motion to dismiss be granted and that the complaint be dismissed. Pursuant to 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and 6(d) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from this date to file a written objection to this Report and Recommendation. Such objection shall be filed with the *Pro Se* Office, with extra copies delivered to the chambers of the Honorable Laura Taylor Swain, Room 755, and to the chambers of the undersigned, Room 1960, 500 Pearl Street, New York, New York 10007. Failure to file timely objections will preclude appellate review.

Respectfully submitted,

*[signature]*

JAMES C. FRANCIS IV
United States Magistrate Judge

Dated: August 17, 2011
New York, New York

Copies mailed this date to:

Raymond Brown
05-A-6373
Elmira Correctional Facility
P.O. Box 500
Elmira, New York  14902

Christina Okereke, Esq.
Assistant Attorney General
120 Broadway
New York, New York  10271